The next case is Donovan Hall and Roger Rubin v. McGhee and Dix. Mr. Wiggins is here for the appellants, Mr. McDonald for the appellees, or Ms. McDonald for the appellees. Mr. Wiggins, you can begin. Okay. Good morning. May it please the Court, Kerry Wiggins, I'm here with Mauli Davis on behalf of the Appellants Council. We view this as generally a misapplication of the record, the video and the audio. But if you'll indulge me just to go briefly what we think are pertinent facts, 115 in the morning, the county officers were serving a civil contempt warrant. They were announcing that they were at the wrong address. They did not state the supervisor in charge of the scene, Sergeant McGhee. The officers increasingly worked themselves up. If the Court has seen the video, it's inescapable that the officers were upset, they were agitated. Part of that was because nobody would open the door, even after they were told the reason why. This is true. Judge Jordan, the officers were privy to some of the 911 calls, the texts that were coming in from the 911 operator. But what they were also privy to was the fact that the sons in the house, Mr. Rubin and Mr. Hall, were terrified. The 911 operator even acknowledged that, the dispatch acknowledged that, and that was being conveyed to the officers. The officers also knew that they were being video recorded. Multiple officers commented that there was a camera or an iPhone that was videotaping them. At least one officer, on the facts that I have just presented to you, which are the facts we would ask the Court to infer in our favor. Well, the critical determination, at least for me, is whether an objectively reasonable officer would consider that his safety was in jeopardy based on what was taking place inside that house. They were crawling on the floor and they were passing things around. It could have been a gun. They were there to serve a civil arrest warrant, but they also had the right to be concerned about their safety as well. Why would an objectively reasonable officer not take into consideration the fact that their safety was in jeopardy when they were passing things around and they wouldn't answer the door and they were crawling around? Would you answer that question? Judge Wilson, it is disputed whether there was crawling. All three residents of the house denied that they were crawling, but there is radio chatter between the officers that there was crawling. Safety is always a question. We are not disputing that. What we are saying is that the officers on the scene knew that they were being video recorded. They knew that the residents called 911 two times. Both sons called 911 and emphatically and repeatedly said, we are terrified. Initially, they didn't know that they were at the right house. Mr. Rubin in his deposition said I didn't know if they were looking for Pablo Escobar. Didn't a neighbor come over and tell them these are police officers? Exactly. The neighbor was the voice of reason on the outside. Mr. Manning, he comes over and he says to Sergeant McGee, can I please talk to Ms. Griffin? I know them. Our daughters play together. He goes to the window. He talks to Ms. Griffin and within minutes, the door opens. You know what? When the door opened, the response from the sergeant and the deputies could have been there. Was that so hard? Thank you. They could have arrested Ms. Griffin right there and taken her away. That is the opposite of what they did. As Sergeant McGee said, we go in forcefully. I mean, we go in with speed. That's in his deposition. He told Ms. McKnight, we are here to serve a warrant and when people aren't opening doors, I'm coming in full force. So I understand there's always a concern about officer safety, but they knew, or at least our version of the facts, they knew that these sons were terrified. Rightly or wrongly, I can't put myself in their shoes, but they were terrified. And when the door opened, all three adults, all three residents, were standing right at the door. There was no need to go blitzing into the house. Well, I'm not sure that that's your strongest argument. I'm not sure you lose on it either, but I thought you were going to concentrate more on what happened once they were inside with regards to Mr. Hall, Mr. Rubin, et cetera, because that's a different sort of allegation. One is, as Judge Wilson mentioned, that they might have had some fear for their safety given what they say they observed and whether they acted maybe a little bit unreasonably or not. They had some basis to go in there and make sure that there was no threat whatsoever. But you have other allegations about what happened once they were inside and had everybody secure. I agree, Judge Jordan. I will add this. The pistol whipping on the entry by Sergeant McGee on Mr. Hall, this court in a case called Walker v. City of Riviera Beach, 2006, it's unpublished. But in that case, this court said pistol whipping is the embodiment of a Fourth Amendment violation with obvious clarity. The allegation here, well, not just allegation, but the testimony viewed in the light most by Sergeant McGee. Is that correct? Well, that would be the most favorable interpretation. Well, did he say he was restrained when he was allegedly pistol whipped or not? This was when they were charging into the house in the takedown phase. But going to your earlier point, Judge Jordan, yes, once they were restrained or subdued, they were still being kicked, punched. You can hear the audio. You know what was being said to them, racial slurs, a homophobic slur to Mr. Hall. These go into, factor into the totality of the circumstances, certainly the reasonableness of the seizure, at least that's our contention. They were, they may not have been in handcuffs right away, but they were certainly subdued because our client, Mr. Hall and Mr. Rubin, were not resisting. Even Officer Williams in his testimony said, no, they weren't physically resisting. Well, here's the part that I got about the restraint. And this is from the district court's order. And the district court's order is citing Mr. Hall's deposition. Plaintiffs claim that Sergeant McGee and other defendants grabbed plaintiff Hall's arms. And when both of his arms were restrained, Sergeant McGee hit Hall in the face with his gun and he cites Mr. Hall's deposition at page 67. Is that not an accurate characterization  No, that's accurate. Yes, that's accurate. We also have the actions with the taser, right? The taser being ground into the back of the defendant and subdued on the ground. He wasn't in handcuffs necessarily at the time. That's not in the record. But these two gentlemen were terrified. Yes, they backpedaled a little bit when the officers charged in the door. That's only natural. They did not resist. They said, stop, stop, stop. What are you doing? We didn't do anything. And that went on and on, even long after they were restrained. But yes. One of the factors that the district court took into consideration was the severity of the injury. It seems, I mean, as a matter of common sense, if one of these guys was pistol whipped, that there would be some sort of manifestation of that. And they didn't really have any observable injuries. Well, you know, Exhibit 9 to Ms. Griffin's deposition is a photograph of Mr. Hall, and there's swelling on the left side of his face. Yes, in other cases, you might see the skin break and maybe fractures, but it just depends. And by the way, the nature of the force, what are you doing pistol whipping a young man in his home when all he's done is ask, why are you here? And I'm scared. That's all he's done. And I see I'm running out of time. I just want to make the language, this is another point I want to bring to the Court's attention, the language, the verbal abuse that Mr. Hall and Mr. Rubin took for almost an hour while sitting handcuffed on their couch absolutely factors into the reasonableness and the manner of the seizure. And I would cite the case of Evans v. Stevens. It's a 2005 case in this Court, and the Court was very careful to say that words do matter. The words that are being used, racial slurs, things like that affect the reasonableness of the seizure. Thank you, Jay. All right. You've reserved some time. Mr. Wiggins, we'll hear from Ms. McDonald. Good morning, Your Honors. May it please the Court. I am Nikki McDonald, and it is my pleasure to represent Defendants McGee, Hall, Dix, and Hunt in this case. Judge Wilson, I think that you hit the nail on the head when the first thing that you said was we have to look at the objective reasonableness of an officer, and were they in fact concerned about their safety. That, of course, is looked at from the perspective of the officer. And so I do want to, if you will indulge me, go through what the officers knew. The officers knew that they had an arrest warrant for Ms. Griffin. The officers knew that when they got to the house, they ran the car, the tag on the car, and it came back registered to Ms. Griffin and also to Plaintiff Rubin. The officers knew that it is common practice for an officer to go to the back to make sure that no one exits from the back. There's radio communication that is part of the record where Officer Jackson said, I see someone crawling in the back. Again, what do the officers know? The officers also knew Dix and Hunt are two defendants that are named in this case. Dix and Hunt were nowhere in the vicinity, but they hear this radio communication being back and forth, you know, the occupants will not open the door, and thought it was necessary because of officer's safety to come to the house. Additionally, the superior officer on scene, Sergeant McGee, also heard the radio communication and deemed it reasonable to go to the house. The 911... What about after they're restrained now? When they get in there and they're restrained? Because I think that's where they're alleging that the excessive force comes into play. Yes, sir. They say that after they're restrained, they were pistol whipped, body slammed, spit at, cursed at, and tased. Yes, sir. Of course, the use of force as it relates to qualified immunity is judged by objective reasonableness, and it is a balance of government intrusion versus the plaintiff's case analysis from the perspective of the officer. No, from the perspective of the officer viewing the facts in the light most favorable to the plaintiff. Okay, sure. Well, even looking at the standard set forth in Penley versus Eslinger, we look at the severity of the crime. We look at whether the plaintiffs posed an immediate threat to the officers. We also look at whether the plaintiffs were actively resisting. The district court, while saying, because of course the big crime at issue here is obstruction, the district court noted that obstruction, while not a severe crime, there were factors that the officers knew that would have raised some type of... The problem for you, as I see it, is the officers deny that any of that took place. They deny that they were cursed. They deny that they were tased. They deny that they were pistol slammed. So we've got a conflict in the testimony. Yes, sir. In that, for the fact finder to decide, if we look at the evidence in a light most favorable to the plaintiffs in this case, accepting their version of the facts as true and not the version of the officers, then isn't the jury entitled to decide who's telling the truth, the plaintiffs or the officers? Well, Your Honor, I think as it relates specifically to the pistol whipping, and there is also an allegation that Plaintiff Hall had his head stood upon by Sergeant McGee. What I cited in my briefing was also cited by the district court, is when you have two stories that are conflicting, but one is completely contradicted by evidence in the record, then the court is not at liberty to accept those facts as true. So as it relates... That's not this record. When did Mr. Hall go to the hospital to see a doctor? Sure. The incident happened around 1, 1.30 in the morning. Mr. Hall went to the DeKalb Medical Center later on that afternoon, so maybe 20 hours later. Well, you know, in 20 hours, someone's swelling can go down. And some people are lucky that if they get hit in a certain way, they don't suffer severe injuries. But he did have swelling from a photograph, did he not? In my opinion, it was not swelling. Okay. So, all right, let's assume that there's no swelling. Is your position here that if, and again, I'm not crediting Mr. Hall's version of the facts as true because we don't know what they are or not, but this is his version, that if a police officer pistol whips a restrained individual without cause, and that individual has no visible injuries, there's no Fourth Amendment claim? Well, Your Honor, I also argued below that these cases fall under the Fourth Amendment. I know, but before you get to the alternative argument, I want to hear the answer to that one. Is there no Fourth Amendment violation? Yes. So I happen to have a really hard skull, and I do okay when someone hits me there and a police officer pistol whips me. But my skin doesn't break. I don't hemorrhage inside. I don't have a fracture. But I was hit with a pistol by a police officer while I was already in cuffs and not resisting. Sure. Do I have a Fourth Amendment claim? I do not think that you have a Fourth Amendment claim, and this is why. I do know that the plaintiffs focus a lot on the nature of the force, which would be the pistol whipping compared to the quantity of injury, and that comes from the Saunders v. Duke case, which this Court ruled on in 2014. The Saunders case was distinguished by the Gomez case a year later. And the huge distinguish, in fact, in that case, Saunders v. Gomez, is that in Gomez, the arrestee was unhandcuffed compared to in Saunders where he was. In this case, I think the allegations are that the plaintiffs were not handcuffed at the time of pistol whipping. And according to the district court's order, the district court citing Mr. Hall's deposition says that Mr. Hall was restrained at the time that he alleges he was pistol whipped. Is that incorrect? Well, what I have is that the district court said that the alleged pistol whipping and standing on Hall's head happened before Hall was handcuffed. And they cite Hall's depo pages 66 through 73. What page are you looking at in the district court's order? I don't have the specific page. Oh, that's okay. Don't worry. But even still, looking at the Gomez case. Can you tell me when, I believe the officer's name was from or from, when his incident report was filed? When did he make that report out and file it? Sure. So Plaintiff Hall went to DeKalb Medical Center, like I said, approximately four in the afternoon on the day of the incident. And once Plaintiff Hall told DeKalb Medical Center what happened to him, DeKalb Medical Center thought that it was appropriate for him to make a statement to the police. So at the time that he was at DeKalb Medical Center, that is when the incident report was given to Officer Pham. And Officer Pham, I understand that allegations as told to him by Plaintiff Hall was what was included in the incident report. But the last sentence in the incident report, again, says that there were no visible injuries. And also another reason why I think that there is not a Fourth Amendment violation is this was de minimis force. Looking at the case of Gomez, the Gomez case involved an ICE agent who essentially roughed up an arrestee. He choked him and hit him against the car. And this court granted the officer qualified immunity. Also, in Crum v. Bulkwheel, which is an 11- What's the citation of Gomez, if you happen to have it there? Sure, I do. It is 601 Fed Append, APPX 841. So it's not a published opinion? No, sir. It is not. Do you have any published opinion from this circuit that says that hitting a restrained suspect who is not resisting, either with a fist, with a gun, with some other object, is not actionable under the Fourth Amendment? Actually, I do not have a case as it relates to restraint. I have cases that speak to- Do you have any from any other circuit that says that in that circumstance, the Fourth Amendment is a sort of force? No, sir. I do not. But I think what the Fourth Amendment does look at, going back to the reasonableness standard, is the severity of the crime, whether the plaintiff is posing immediate threat or whether they- I know, but once you have, that's why the allegations and the testimony make a lot of difference. And if the allegations were that he was still resisting or causing trouble, that would be one thing. But if the allegation is that the person is restrained, not resisting, the need for force necessarily goes down some, right? Well, I would say not necessarily so. And this is why. Looking at, again, the governmental interest of officer safety, there was a heightened sense of awareness, and that is testimony in the record. Sergeant McGee said that the crawling on the floor and the refusal to open the door increased his security awareness. The same for Jackson, the same for Dix, the same for Hunt. Also, there were other deputies that came to the scene who had the same opinion of, okay, something is going on inside this house. I understand that obstruction is a lower severity crime, but maybe there are narcotics in the house. Maybe there are weapons. Maybe there are other contraband in the house. And because officers have essentially... But the concern that I have is once all that took place, and then once they were restrained, did they go overboard? Once they're restrained and on the ground and they're handcuffed, I think what they're saying is they went a little overboard with the tasing and the pistol whipping and the spitting and the cursing and the body slamming. And so, but the officers say they didn't do it. And so, you got two conflicting versions. And so, I mean, we've got to look at the evidence in a light most favorable to the plaintiffs. And let's say if this is an issue for the jury, counsel for the plaintiffs can impeach the credibility of the officers by cross-examining them about being disciplined for a neglect of duty and omitting facts from their reports. Right? That is what... In fact, Officer McGee was offered to either retire or be demoted. That would all come out at the trial, right? Presumably, sir. Yes. Would not you argue for your clients that Mr. Hall's version was blatantly contradicted by the evidence? The medical report showed no trauma, no head trauma, no facial issues. And then the incident report showed that there were no visible injuries, but it did show that his knee was sore and his back was sore and they gave him some minor medication. But why does the court below have to take Mr. Hall's version of it if it's blatantly contradicted by the evidence? Well, Your Honor, I definitely agree with that point. And that is something that I raised below and in this court. The case that I cited was Singletary v. Vargas, which is 804 F.3.1174. It is an 11th Circuit 2015 case, which lays out exactly what you just said. When there is a blatant contradiction, Judge Wilson, as you said, common sense tells us if an individual is pistol whipped by an officer and there is testimony, and you can see from the video, Sergeant McGee is a rather large guy. And I had my faith stepped upon there would be some type of manifestation. And what would that manifestation be, do you think, that is flatly contradicted by the record 20 hours later? Manifestation would be some type of abrasion, some type of lesion, some type of bruising, possibly even an open cut on the face. And even when you look at the photo that I think counsel referred to as Exhibit 9 in Ms. Griffin's deposition, you don't see any of that in there. So the record that, the evidence in the record that blatantly contradicts the plaintiff's story would be the medical records? The medical records in addition to the incident report of the police officer that was given while defendant, excuse me, while Plaintiff Hall was at the DeKalb Medical Center. But that can't, that can't be used? The medical records? No, no, no. The incident report, if it's contradicted by the plaintiff's testimony. A police officer prepares a report about what just happened during an arrest, right? Okay. That officer gets sued under 1983 for, let's say, false arrest or excessive force. The plaintiff denies everything that's in the report. You can't use the report at summary judgment to win, right? To establish facts, right? The report was based on the allegations that were told to the officer by Plaintiff Hall. So those are Plaintiff Hall's exact words. But he denies that he said that. Plaintiff Hall denies that he said the statements in Officer Pham's incident report. As they were relayed in that report, does he not? No, sir. I don't think so. Was he asked the question of whether or not he told that story to the officer? Yes, I do remember asking him during his deposition if he provided that report to the officer. In reading the incident report, those are the words of Hall and the allegations that he claims took place the early morning hours prior to. The last sentence in the incident report, the officer indicates that he did not see any visible injuries. And so that is part of what is what I believe to be blatantly contradictory to the story that was given to Plaintiff Hall. Your Honor, I see that I am running out of time. And so I would submit, and I think that we're kind of streamlining this argument here. The district court properly ruled that the defendants were entitled to qualified immunity. I would submit that the pistol whipping and the alleged allegation of standing on the head do not even be considered by this court based on the blatant contradiction of the medical records and the incident report. Briefly, as it relates to the tasing, repressing of the taser against the head by defendant Jackson. Jackson, in looking at the nature of force versus the extent of the injury, because here, I mean, we did not see any injury as a result of that tasing. The plaintiffs relied on the Saunders v. Duques for the fact that courts have now shifted their focus to the nature of the injury versus the, to the nature of the force versus the injury. But in further reading that, what the complete quote from Wilkins versus Gaddy, which is the 599 U.S. 34 2010 case, is whether that force was applied to cause harm. And it is investigator Jackson's testimony that he, well, first of all, he denied that he even pressed the taser against the head. But assuming that fact to be true, what this court has to look at is whether that act was done to harm the plaintiff, and I submit that it was done to gain compliance. And for those reasons, your honors should affirm the district court's decision. Thank you. Thank you, Ms. McDonald. We'll hear from Mr. Wiggins. Thank you. We would be going into bad territory if we were to deny a jury trial on the basis of a police report and a statement in a medical record. The fact is that Sergeant McGee stood on Mr. Hall's head. He used the mantle to balance while he was standing on his head. He pistol whipped Mr. Hall. There was some swelling. That is a triable question. The idea that you could use gratuitous force when the plaintiff or the suspect is not resisting has been resoundingly upheld as a violation of the Fourth Amendment. This court, Hadley v. Gutierrez, 2008, published decision. Reese v. Herbert, 2008, published decision. This year, in an unpublished decision, Horne v. Barron, the court found that there was not a violation of the Fourth Amendment, excessive force, but let me just read you the few sentences at the end of that case. Officer Barron used a minimal level of force, a soft hands, straight arm, bar takedown technique to do so. He did not use a weapon. He did not hit, punch, or kick her. He did not have assistance from multiple officers. He did not throw Horne to the ground with intentional or gratuitous unwarranted force, nor did he use any force against her after she was on the ground. He did not use any force intended to cause injury. Rather, Horne's injury was the unfortunate result of Officer Barron's reasonable use of force. This case is the opposite of that. There are no more questions. That's all I got. Thank you. All right. Thank you, Mr. Wiggins.